UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| In the Matter of the Extradition of | ) | |
| | ) | 1:19mj378 |
| June Hopkins Saia a/k/a June Walsh a/k/a | ) | |
| June Hopkins-Saia Walsh | ) | |

## MEMORANDUM IN SUPPORT OF EXTRADITION

### I.     Statement of the Case

On December 6, 2019, the United States, in response to an official request from the Government of France and in fulfillment of its treaty obligations to France, initiated this extradition proceeding by filing a Complaint pursuant to 18 U.S.C. § 3184 and the extradition treaty between the United States and France.[1] (Dkt. 1.) In the Complaint, the United States requested that June Hopkins Saia ("Hopkins Saia" or the "fugitive") be arrested pursuant to Article 13 of the Treaty, which provides for the provisional arrest of a fugitive pending a formal request for extradition.

---

[1] Extradition Treaty Between the United States of America and France, with Agreed Minute, U.S.-Fr., Apr. 23,1996, S. TREATY DOC. NO. 105-13 (1997), 1996 WL 905553 (the "1996 Treaty"), as amended by the Instrument as contemplated by Article 3, paragraph 2, of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the United States of America and France signed 23 April 1996, U.S.-Fr., Sept. 30, 2004, S. TREATY DOC. NO. 109-14 (2006), 2003 WL 25299215 (the "Instrument") (collectively, the "Treaty").

Also on December 6, 2019, United States Magistrate Judge L. Patrick Auld issued an arrest warrant for Hopkins Saia. (Dkt. 2.) On December 9, 2019, the United States Marshals Service executed the warrant, arresting Hopkins Saia in Winston-Salem, North Carolina. (Dkt. 5.) Hopkins Saia has been in the custody of the United States Marshals Service since that time.

On December 9, 2019, Hopkins Saia made an initial court appearance, at which time she made an oral motion for her release. The United States orally requested that she be detained, and filed a written memorandum in support of that request the next day, on December 10, 2019. (Dkt. 6.) The Court took these motions under advisement.

On December 16, 2019, the Court held a hearing regarding Hopkins Saia's eligibility for the appointment of counsel. The Court requested briefing on the issue and continued to take the issue of detention under advisement.

On February 10, 2020, the Court held a status conference to determine whether the Government of France had complied with Article 13 of the Treaty. The United States reported that France had complied by sending a formal request for extradition, along with the required supporting documents, to the United States Department of State, which was evaluating the materials. The Court ordered the United States to file the documents, along with an extradition memorandum, by March 13, 2020. The Court also held that it did

Case 1:19-mj-00378-LPA   Document 12   Filed 03/13/20   Page 2 of 27

not have the authority to appoint counsel for Hopkins Saia, but stated that the Clerk's office would attempt to locate counsel for her pursuant to the Court's pro bono representation program. On February 12, 2020, attorney Helen L. Parsonage filed a notice of appearance for Hopkins Saia. (Dkt. 11.)

It now remains for the Court to conduct an extradition hearing pursuant to statute, discussed in further detail below. In short, the Court's limited role is to determine whether France has presented evidence "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C. § 3184. The standard for this finding is a familiar one: probable cause. If the Court finds there is probable cause to believe Hopkins Saia committed the crime as alleged by France, it will certify as much to the Secretary of State, who will make the final determination regarding Hopkins Saia's extradition.

Because France has submitted more than enough evidence to demonstrate probable cause, and the other requirements for extradition have been met, the United States requests that the Court certify to the Secretary of State that Hopkins Saia can be extradited to France.

## II.    **Statement of Facts**

France's Formal Request for the Extradition of June Hopkins Saia is attached hereto as **Government Exhibit 1**.[2] According to the information France has submitted, Hopkins Saia attempted to kill Grégoire Lautissier ("Grégoire") and/or his sister, Frédérique Varennes ("Frédérique"), on February 17, 2015, at or around 7:15 p.m., near Frédérique's home in Chatou, France.[3] In the extradition request, Deputy Chief Prosecutor Jean-Marc Coquentin extensively detailed the evidence French authorities have gathered against Hopkins Saia. The United States will not restate that evidence verbatim, but instead provides the following summary.

### A.    **Relevant Relationships: Hopkins Saia, Grégoire Lautissier, and Brendan Lautissier**

- In France in the early 1990s, Grégoire had a "love relationship" with Hopkins Saia (then known as June Walsh, resulting in the birth of two sons: Brendan Walsh-Lautissier (a/k/a Brendan Lautissier, the other fugitive in this case, hereinafter "Brendan"; see generally In re Extradition of Lautissier, 1:19-mj-377 (M.D.N.C.)) and Austin Walsh-Lautissier. Hopkins Saia returned to the United States for each birth (in 1992 and 1994, respectively) (GE 1 at 23.)

- Grégoire "recognized both his children," but he "practically never had any contact" with them until 2009. (Id.)

---

[2] Government Exhibit 1 has been Bates labeled EXT-HOPKINS SAIA-00001–00089. Hereafter, the United States will use the convention "GE 1 at x," with "x" being the bates labeled page in question.

[3] Chatou is a commune (i.e., township) in the Yvelines department in the Île-de-France region, about 11 miles outside of Paris.

- 4 -

- In September 2009, Hopkins Saia returned to France and told Grégoire that she was going through financial difficulties. For a time—between September 2009 and June 2010—Grégoire transferred $1,000 a month to Hopkins Saia. (GE 1 at 23–24.)

## B.  Attack on August 20, 2010

- On August 20, 2010, Hopkins Saia and Brendan were in Grégoire's home in Paris. Grégoire had realized that Hopkins Saia had taken tax and other financial documents from his home, and he was discussing this with Hopkins Saia and Brendan. When the discussion "was getting sharp," Brendan presented Grégoire with two documents and asked him to sign them. Grégoire said that he should read the documents. He was then quarrelling with Hopkins Saia "when he felt a liquid dropping on his back and heard a noise of a lighter clicking twice." He looked back and saw Brendan "holding a lighter and trying to set him ablaze." The liquid Grégoire felt was gasoline, sprayed from a 1-liter bottle of "special barbecue," with the brand name "LANDMANN," and "whose origin was unknown to him." Grégoire was sprayed with enough gasoline that his shirt was "soaking wet and [there was] a heavy smell of gasoline in the air." Grégoire "dealt a blow" to Brendan to make him drop the lighter. Brendan then retrieved a "small Japanese sword from behind the sofa" where Hopkins Saia was sitting. By this time, Grégoire's brother, Antoine Lautissier ("Antoine"), had come into the room and "immediately grasped [Brendan] around the waist and brought [him] down to the ground." Grégoire then "isolated himself in his room" and Antoine asked Hopkins Saia and Brendan to leave. Antoine escorted them to a hotel. (Id. at 24–25.)

- During this attack, Hopkins Saia "did not show any reaction and remained silent." (Id. at 24.)

- Investigators subsequently gathered witness statements and physical evidence that supported Grégoire and Antoine's account of the attack. (Id. at 25–26.)

- 5 -

**C.** **The Time Between the Attack on August 20, 2010, and the Attack on February 17, 2015**

- Hopkins Saia and Brendan "being unfound" after the attack on August 20, 2010, an arrest warrant was issued for Brendan on May 14, 2014. Neither could be located by French authorities until on or about February 18, 2015. (GE 1 at 25, 32, 36, 53.)

- In 2014, Frédérique's husband saw Hopkins Saia and Brendan "roaming around" near Frédérique's home. (Id. at 32.)

- Also in 2014, Grégoire was the subject of "intimidation maneuvers." Seven "posters, letters and other attestation of suicide" were "plastered several nights in a row" on the door of his home in Paris. One poster read "Grégoire go to United States March 30-31, 2014 try to kill the mother of his sons again!" In others, Grégoire was described as "a monster" and "culprit" and promised "prison" and "hell." Another document was a purported "suicide letter" in which the writer, purporting to be Grégoire, stated, "[I] would like to be rendered responsible of many of my own atrocities." (Id. at 32.)

    o Investigators later discovered sheets of paper in Hopkins Saia and Brendan's apartment with notes such as "Greg, you are a killer! Now you try to kill again." (Id. at 34.)

- At some point prior to February 17, 2015, Grégoire moved in with Frédérique and was living in her apartment in Chatou. (Id. at 28.)

- Also prior to February 17, 2015, Hopkins Saia "had put on several occasions devices to collect audiovisual elements in addition to taping devices" outside Frédérique's apartment. The building janitor found three devices corresponding to this description and gave them to investigators. The janitor indicated that he saw "a blond woman escorted by a young man with long hair" placing the devices. (Id. at 34.)

    o Investigators later discovered, on Brendan's phone, a folder named "VIDEOS," which "consisted of content related to tracking the house of Mrs. VARENNES and her car in

- 6 -

addition to audiovisual recordings of the surroundings of the Grégoire LAUTISSIER's Parisian home." (GE 1 at 34.)

o Investigators also found audio and video devices in Hopkins Saia and Brendan's apartment, which were similar to those provided by the janitor. (Id.)

## D. The Attack on February 17, 2015

- On February 17, 2015, at 7:15 p.m., Frédérique was "on the pavement facing the gate of her villa, [when] she received a violent blow on the back of her head which made her lose her balance and fall on the ground." An individual wearing a helmet, with a scarf hiding the lower part of the face, then tried to strangle Frédérique. Frédérique bit the hand of the attacker, and a second attacker came to help the first attacker. The second attacker handed a "cable-like element" to the first attacker, who tried to pass it around Frédérique's neck. Frédérique shouted for help, and a nearby bicyclist, Bruno Couzin ("Couzin") came to her aid. (Id. at 28–29.)

- Couzin stated that both attackers were wearing helmets. He saw that one of the attackers, a woman, was trying to immobilize the legs of the victim, who was a woman on the ground trying to escape. The other attacker was at the victim's head, "smashing her neck with one of his knees." The victim was calling out for help. Couzin asked the attackers to let the victim go. He heard the attackers speaking to each other in English. Couzin realized that the attackers were not answering him, so "he tried in vain to move away the individual who was smashing the victim's neck." Couzin said he would call the police, but the female attacker replied in English that she did not care. Couzin saw the female attacker's face, and he described her as a Caucasian woman. (Id. at 29, 30–31.)

- Couzin, unable to stop the attack, screamed for help, and another nearby individual, Patrice Coisnon ("Coisnon"), responded. Coisnon saw that a woman was on the ground being attacked by two individuals, screaming that they were trying to kill her, while another individual (Couzin) was asking for help "to release the victim from the attackers' grip." Coisnon saw that the attacker holding the victim's legs was a woman. Coisnon pushed the attacker who was at the

- 7 -

victim's neck, destabilizing the attacker enough to allow the victim to move away. Coisnon saw a cable in the attacker's hands. (GE 1 at 30–31.)

- The two attackers ran away, taking a suitcase with them. (Id. at 31.)

    o Investigators subsequently discovered a suitcase in Hopkins Saia and Brendan's apartment, which contained "military-like material" such as an "army jacket and a camouflage net" and "diverse tools (a saw, an axe, a machete, goggle, gloves, roll of cords[)]," and audio and video equipment similar to what the janitor had provided to investigators. (Id. at 35.)

- At this point, Grégoire came out of the house and saw his sister, Frédérique, moaning on the ground. Frédérique told Grégoire that she had been attacked by "the Americans." Grégoire asked Couzin to take care of Frédérique, and then he and Coisnon pursued the attackers. (Id. at 28, 31.)

- At some point in his pursuit of the attackers, Grégoire located Hopkins Saia and Brendan "in front of the Séquoia residence." "As he considered them the ones behind the attack on his sister, he punched his son's face." (Id. at 28.)

- By the time Coisnon arrived at this second scene, he saw that the male who had attacked Frédérique had taken off his helmet, was bleeding from the nose, and was "standing astride on top of Grégoire," strangling him with a cable. Coisnon also saw that the female attacker had removed her helmet and was "trying to hinder" Grégoire, who was suffocating. Coisnon[4] tried to pull away the attacker who was strangling Grégoire "by hammering with his fists the individual's arms and face," but the attacker refused to let go and kept on strangling Grégoire. Coisnon then pushed the female attacker, making her fall on the ground. Coisnon then returned to the other attacker "to tackle [him] giving blows with his knees on the sides of his body." (Id. at 31.)

---

[4] The extradition request states "COUZIN" at this point, but it is clear from the surrounding narrative and other references to Coisnon that this is a typo, and that it was Coisnon who aided Grégoire at the scene of the second attack.

- 8 -

- Other individuals arrived at the scene at this point, and the attacker strangling Grégoire finally let go. Coisnon then went to hold the female attacker while waiting for the police to arrive. However, Coisnon saw that the male attacker was coming towards him, and it looked to the other witnesses as though Coisnon, by holding the female attacker, was "aggressing a lady," so he let the female attacker go. Both attackers then ran away. (GE 1 at 31.)

- Grégoire told authorities that he had seen Hopkins Saia's face, and identified his attackers as Brendan and Hopkins Saia. (Id. at 28.)

- Other witnesses provided statements corroborating the accounts of Grégoire and Coisnon, i.e., that a "coated man" (Brendan) had been strangling a 50-year old man (Grégoire), and that a young man (Coisnon) was holding down an older blond woman (Hopkins Saia), and that the coated man (Brendan) and the blond woman (Hopkins Saia) escaped, the man (Brendan) pulling a big suitcase. (Id. at 32.)

- Investigators recovered and tested numerous items of physical evidence from the scenes of both attacks. (Id. at 29–30.)

  o From the first scene, they recovered a black latex glove. (Id. at 29.)

    ▪ The interior of the glove was tested and found to contain Hopkins Saia's DNA. (Id. at 30.)

    ▪ The exterior of the glove was tested and "reveal[ed] a complex mixture of the DNA of Frédérique VARENNES and the DNA of June HOPKINS SAIA all along with the presence of traces of other non-identifiable DNA profiles." (Id.)

  o From the second scene, they found a white electric cable, a tuft of Grégoire's hair, a woolen neck scarf, and a piece of fabric. (Id. at 29.)

    ▪ The electric cable and blood on the scarf were tested and found to contain Brendan's DNA. (Id. at 29–30.)

- 9 -

### E.  Subsequent Events

- On or about February 18, 2015, Hopkins Saia and Brendan were arrested as they were trying to leave France for the United Kingdom. (GE 1 at 32, 53.)

- In subsequent French criminal proceedings, Hopkins Saia and Brendan did not deny being involved in altercations with Frédérique and Grégoire on February 17, 2015. Instead, they claimed that Frédérique and Grégoire were the true aggressors. (Id. at 33–34.)

- Hopkins Saia and Brendan were "placed in temporary detention" following their arrests. (Id. at 36.)

- On December 13, 2016, Hopkins Saia attempted to escape the penitentiary where she was housed "by removing the bars of her cell using frozen water bottles." (Id. at 36.)

- On February 19, 2018, Hopkins Saia and Brenden were "liberated and placed under probation (judicial supervision)" pending further proceedings. However, when they did not reply to a judicial summons, the investigating judge issued warrants for their arrest on August 3, 2018. On December 21, 2018, the District Attorney of Paris issued and published European Arrest Warrants for them. (Id. at 36, 37, 38, 51, 56.)

- Once it was discovered that Hopkins Saia and Brendan were in the United States, French authorities initiated the process the Treaty contemplates to request their arrest with a view toward extradition, and the United States initiated these proceedings in fulfillment of its Treaty obligations. (Id. at 2, 22, 36, 37; Dkt. 1.)

### III.  Legal Framework and Argument

The extradition process is neither a criminal nor a civil proceeding, but is a *sui generis* creation of statute. This process is outlined below.

- 10 -

## A.    General Principles of International Extradition

The extradition process is primarily a function for the executive branch. See Zhenli Ye Gon v. Holt, 774 F.3d 207, 210 (4th Cir. 2014) ("The process of extraditing a non-United States citizen to a foreign nation is conducted largely by the United States Department of State . . . ."). The extradition statute does, however, authorize a judicial officer to hold a hearing to determine whether the evidence submitted by the requesting nation is "sufficient to sustain the charge under the provisions of the proper treaty." 18 U.S.C. § 3184; see also Zhenli Ye Gon, 774 F.3d at 210; Sidali v. INS, 107 F.3d 191, 195 (3d Cir. 1997), cert. denied, 522 U.S. 1089 (1998). If the judicial officer deems the evidence to be sufficient, he "shall certify the same" to the Secretary of State. 18 U.S.C. § 3184. It is ultimately the Secretary of State, not the court, that decides whether a fugitive should be surrendered to the requesting nation. 18 U.S.C. §§ 3184, 3186; Plaster v. United States, 720 F.2d 340, 354 (4th Cir. 1983). "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which the extradition magistrate may not." Martin v. Warden, Atlanta Penitentiary, 993 F.2d 824, 829 (11th Cir. 1993).

An extradition hearing is not a full trial. <u>Zhenli Ye Gon</u>, 774 F.3d at 210.

Rather, its purpose is

> to determine (1) whether there is probable cause to believe that there has been a violation of the laws of the foreign country requesting extradition, (2) whether such conduct would have been criminal if committed in the United States, and (3) whether the fugitive is the person sought by the foreign country for violating its laws.

<u>Id.</u>; <u>see also</u> <u>Mironescu v. Costner</u>, 480 F.3d 664, 665 (4th Cir. 2007); <u>Peroff v. Hylton</u>, 542 F.2d 1247, 1249 (4th Cir. 1976). In addition to these requirements, courts often address these additional factors:

> 1. Whether the judicial officer is authorized to conduct extradition proceedings;
>
> 2. Whether the Court has jurisdiction over the [fugitive];
>
> 3. Whether the applicable treaty is in full force and effect; [and]
>
> 4. Whether the crime for which [the fugitive's] surrender is sought is included within the terms of the treaty[.]

<u>In re Extradition of Exoo</u>, 522 F. Supp. 2d 766, 775 (S.D.W. Va. 2007); <u>see also</u> <u>In re Extradition of Hughes Lagadec</u>, 394 F. Supp. 3d 542, 545 (E.D.N.C. 2019). Out of an abundance of caution, the United States will show that all of these requirements/factors are satisfied.

- 12 -

The most substantive of these requirements is the demonstration of probable cause. In showing probable cause, the United States is not required to show the ultimate guilt of the fugitive. That task is "committed to the justice system of the requesting country." <u>Haxhiaj v. Hackman</u>, 528 F.3d 282, 292 (4th Cir. 2008). Accordingly, the requesting government is not required to present any "actual evidence." <u>Id.</u> On the contrary, "hearsay is an acceptable basis for a probable cause determination in the extradition context." <u>Id.</u> Unsworn statements are also acceptable, and the Federal Rules of Evidence do not apply. <u>Id.</u>[5] In sum, "the magistrate judge has a great amount of latitude in considering evidentiary support for an extradition request." <u>Id.</u>

On the other hand, "[t]he range of evidence that a [fugitive] may introduce as to probable cause at an extradition hearing is limited." <u>Hoxha v. Levi</u>, 465 F.3d 554, 561 (3d Cir. 2006) (collecting cases). Courts typically do not allow the introduction of "contradictory evidence," i.e., evidence that "merely conflicts with the government's evidence." <u>Id.</u> Examples of such inadmissible evidence are "evidence of alibi or of facts contradicting the demanding country's proof or of a defense such as insanity." <u>Shapiro v. Ferrandina</u>, 478 F.2d 894,

---

[5] <u>See also</u> Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition.").

Case 1:19-mj-00378-LPA   Document 12   Filed 03/13/20   Page 13 of 27

901 (2d Cir. 1973). Nor may a fugitive introduce evidence that "impeaches the credibility of witnesses." Exoo, 522 F. Supp. 2d at 777. Courts may, however, allow the introduction of "explanatory evidence," which "entirely eliminates probable cause." Hoxha, 465 F.3d at 561. An example of explanatory evidence is a confession induced by torture and recanted at the first opportunity. See Matter of Extradition of Garcia, 890 F. Supp. 914, 924 (S.D. Cal. 1994).

In practice, the line between contradictory and explanatory evidence "is often difficult to fix." Ordinola v. Hackman, 478 F.3d 588, 609 n.1 (4th Cir. 2007) (Traxler, J., concurring); see also Koskotas v. Roche, 931 F.2d 169, 175 (1st Cir. 1991). The guiding principle to keep in mind is that a fugitive's presentation of evidence must be "of limited scope and have some reasonable chance of negating a showing of probable cause." Koskotas, 931 F.2d at 175. Maintaining this limited scope is essential, ensuring that "extradition proceedings are not . . . converted into a dress rehearsal trial." Id.[6]

---

[6] It is also noteworthy that a fugitive's constitutional rights are limited. For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing or confront his accusers, see Ordinola, 478 F.3d at 608; Bingham v. Bradley, 241 U.S. 511, 517 (1916); and no Sixth Amendment right to a speedy extradition, see McDonald v. Burrows, 731 F.2d 294, 297 (5th Cir. 1984); Martin, 993 F.2d at 829; Sabatier v. Dabrowski, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable, see Simmons v. Braun, 627 F.2d 635, 636–37 (2d Cir. 1980); and the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, see Collins v. Loisel 262 U.S. 426, 429 (1923); Matter of Extradition of McMullen, 989 F.2d 603, 612–13 (2d Cir. 1993), cert. denied, 510 U.S. 913 (1993).

Once the evidentiary record is complete, the Court should make written findings of fact and conclusions of law as to each of the elements for certification, including separate findings for each offense for which extradition is sought. <u>Shapiro</u>, 478 F.2d at 905–06.

## B.     The Requirements for Certification Are Satisfied Here

The materials submitted by the Government of France satisfy all of the requirements for extradition, as shown in the succeeding sections.

### 1. The Court Has Jurisdiction and Authority Over these Proceedings

By statute, extradition proceedings may be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. In this District, a magistrate judge is authorized to conduct such proceedings. LR 72.1(b)(15).

### 2. The Court Has Jurisdiction Over Hopkins Saia

A court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person *found within his jurisdiction* . . . issue his warrant for the apprehension of the person so charged.") (emphasis added); <u>see also</u> <u>Pettit v. Walshe</u>, 194 U.S. 205, 218–19 (1904); <u>Zhenli Ye Gon</u>, 774 F.3d at 210.

- 15 -

The United States Marshals Service arrested Hopkins Saia in Winston-Salem, North Carolina, within the boundaries of this District. (Dkt. 5.) The personal jurisdictional requirement of 18 U.S.C. § 3184 is therefore met.

### 3.  Hopkins Saia Is the Person Sought By France

There has never been a dispute over the identity of Hopkins Saia as the person sought by France. From her initial appearance until the present time, Hopkins Saia has confirmed her identity. She has disputed the legitimacy of the criminal proceedings in France, and the accuracy of the evidence against her, but she has never disputed that she is in fact the person France is seeking.

### 4.  The Extradition Treaty with France Is In Full Force and Effect

The extradition statute provides for extradition "[w]henever there is a treaty or convention for extradition between the United States and any foreign government." 18 U.S.C. § 3184.

Here, the United States has provided a declaration from Tom Heinemann, Assistant Legal Adviser for the U.S. Department of State, attesting that the Treaty is in full force and effect (the "Heinemann Declaration," attached hereto as **GE 2**). The Department of State's determination is entitled to deference from the Court. See Terlinden v. Ames, 184 U.S. 270, 288 (1902); Kolovrat v. Oregon, 366 U.S. 187, 194 (1961) ("While courts interpret treaties for themselves, the meaning given them by the

- 16 -

departments of government particularly charged with their negotiation and enforcement is given great weight"); Charlton v. Kelly, 229 U.S. 447, 468 (1913); Kastnerova v. United States, 365 F.3d 980, 985–87 (11th Cir. 2004), cert. denied, 541 U.S. 1090 (2004); Garcia, 109 F.3d at 171; Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996).

### 5. The Treaty Covers the Crime for Which France Seeks Extradition, Which Is Also a Crime Under U.S. and North Carolina law

Article 1 of the Treaty provides for the extradition of "persons whom the competent authorities in the Requesting State have charged with or found guilty of an extraditable offense." Article 2 of the Treaty states, in relevant part, that "[a]cts shall be extraditable if they are punished under the laws in both States by deprivation of liberty for a maximum of at least one year or by a more severe penalty."[7] The Treaty also provides that an offense "shall be an extraditable offense" regardless of whether (a) the Contracting States "place the offense within the same category of offenses or describe the offense by the same terminology"; (b) United States federal law requires proof, or an element of proof, such as "passage from one state to another, the use of the mails, wire, and other facilities of interstate or foreign commerce . . . since such an element

---

[7] The Treaty is thus what is known as a "dual criminality" treaty.

is required for the sole purpose of establishing the jurisdiction of United States federal courts." (Treaty Art. 2(3).)[8]

Consequently, the Court should examine the description of criminal conduct that France has provided in support of extradition and decide whether that conduct would have been criminal under U.S. law if committed in this country. Dual criminality exists if the conduct involved in the foreign offense would be criminal under either U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states. Cucuzzella v. Keliikoa, 638 F.2d 105, 107–08 (9th Cir. 1981); In re Extradition of Manzi, 888 F.2d 204, 207 (1st Cir. 1989); Quintanilla v. United States, 582 F. App'x 412, 414 (5th Cir. 2014).

Because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" Grin v. Shine, 187 U.S. 181, 184 (1902), the Court should "approach challenges to extradition with a view towards finding the offenses within the treaty." McElvy v. Civiletti, 523 F. Supp. 42, 48 (S.D. Fla. 1981). "The point of an extradition treaty after all is to facilitate

---

[8] Further, the Treaty provides that if the Requesting State seeks extradition for distinct acts, each punishable under both parties' laws by deprivation of liberty, "and if some of the acts" do not carry a potential minimum penalty of one year of imprisonment, "the Requested State shall nonetheless grant extradition based upon such acts." Treaty Art. 2(5).

- 18 -

extradition . . . ." <u>Martinez v. United States</u>, 828 F.3d 451, 463 (6th Cir. 2016) (<u>en banc</u>), <u>cert. denied</u>, 137 S. Ct. 243 (2016).[9]

Thus, a requesting country is not obliged to establish that its crimes are identical to ours. In <u>Collins v. Loisel</u>, the Supreme Court held that dual criminality exists "if the particular act charged is criminal in both jurisdictions," even if the name of the offense or the scope of the liability differs in the two countries. 259 U.S. 309, 312 (1922). "This language has been broadly accepted as establishing that dual criminality requires only that the offenses in the two countries punish the same basic evil; it does not require that the offenses contain identical elements." <u>Zhenli Ye Gon</u>, 774 F.3d at 217; <u>see also</u> <u>Kelly v. Griffin</u>, 241 U.S. 6, 15 (1916); <u>Gallo-Chamorro v. United States</u>, 233 F.3d 1298, 1307 (11th Cir. 2000), <u>cert. denied</u>, 516 U.S. 811 (1995); <u>United States v. Saccoccia</u>, 58 F.3d 754, 766 (1st Cir. 1995), <u>cert. denied</u>, 517 U.S. 1105 (1996); <u>United States v. Riviere</u>, 924 F.2d 1289, 1302 (3d Cir. 1991) ("[T]he rule of double criminality does not require that the elements, purposes, or punishment for foreign offenses be identical to ours.").

Dual criminality exists in this case.

---

[9] Moreover, the Supreme Court has established a general requirement to construe extradition treaties liberally, in favor of extradition. <u>See</u> <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 303 (1933) ("Extradition treaties are to be liberally, not strictly, construed.").

- 19 -

France seeks Hopkins Saia's extradition for attempted murder, in violation of Articles 121-4, 121-5, 132-71-1, 221-3 subp.1, 221-1, 221-4, 221-8, 221-9, 221-9-1, and 221-11 of the French Criminal Code, which carries a potential penalty of life imprisonment. (GE 1 at 35, 52, 55, 66–72.) Hopkins Saia's alleged conduct, if committed here, would violate federal law—18 U.S.C. § 1113 (attempt to commit murder, punishable by up to twenty years imprisonment)—and North Carolina law—N.C. Gen. Stat. §14-17 (murder) in conjunction with N.C. Gen. Stat. § 14-2.5 (attempt to commit a felony is punishable "under the next lower classification as the offense which the offender attempted to commit," making attempted murder a Class B2 or C felony, punishable by 44–393 months imprisonment, N.C. Gen. Stat. § 15A-1340.17).

Accordingly, the Treaty covers the crime for which France seeks the extradition of Hopkins Saia, which would also have been a crime under U.S. federal law and/or North Carolina law had it been committed here.

### 6. Probable Cause Exists to Believe that Hopkins Saia Committed the Alleged Offense

The standard of proof to find the evidence "sufficient to sustain the charge under the provisions of the proper treaty," 18 U.S.C. § 3184, is probable cause. See Haxhiaj, 528 F.3d at 288; Peroff, 542 F.2d at 1249. As summarized by the Third Circuit, "[t]he probable cause standard applicable in extradition

proceedings has been described as evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." Sidali, 107 F.3d at 199 (citations, brackets, and quotation marks omitted).

In this case, the extradition request from France establishes probable cause to believe that Hopkins Saia committed the offense of attempted murder when she and Brendan attacked and attempted to kill Frédérique and/or Grégoire on February 17, 2015. France's extradition submissions include the certified statement of Deputy Chief Prosecutor Jean-Marc Coquentin, which cites evidence including, as detailed above (supra at 4–10), physical evidence and numerous witness statements. (GE 1 at 22–37.) Indeed, it appears that Hopkins Saia and her son Brendan nearly strangled both victims to death, and were prevented from doing so only by the timely intervention of two brave bystanders, Bruno Couzin and Patrice Coisnon.

In previous French legal proceedings, Hopkins Saia admitted that she was at the scenes of the attacks, and that she was involved in altercations with Frédérique and Grégoire. She claimed that Frédérique and Grégoire were the aggressors, not her and Brendan. She may continue to take this position before this Court, but if so, she would be presenting classic "contradictory evidence" that is inadmissible in extradition proceedings. (Supra at 13–14.) It is for the

- 21 -

French courts, not this Court, to hear and resolve any issues of witness credibility and any alleged contradictions in the evidence. This Court need only determine whether French authorities have shown probable cause to believe that Hopkins Saia committed the offense for which France seeks extradition. Because the extradition request is more than sufficient to demonstrate probable cause, the Court should certify to the Secretary of State that Hopkins Saia can be extradited to France.

## C. Additional Extradition Principles and Procedures

In addition to the main factors described above, the following principles and procedures further explain the extradition process:

- The fugitive has no right to discovery. <u>Prasoprat v. Benov</u>, 421 F.3d 1009, 1014 (9th Cir. 2005), <u>cert. denied</u>, 546 U.S. 1171 (2006); <u>Messina v. United States</u>, 728 F.2d 77, 80 (2d Cir. 1984).

- Courts routinely reject technical and affirmative defenses in extradition proceedings. <u>See</u> <u>Bingham</u>, 241 U.S. at 517 (rejecting objections that "savor of technicality"); <u>Charlton</u>, 229 U.S. at 462; <u>Collins</u>, 259 U.S. at 316–17; <u>Hooker</u>, 573 F.2d at 1368; <u>DeSilva v. DiLeonardi</u>, 125 F.3d 1110, 1112 (7th Cir. 1997), <u>cert. denied</u>, 525 U.S. 810 (1998).

- Extradition hearings rely on written submissions and do not require live witnesses or actual evidence. <u>See</u> <u>Artukovic v. Rison</u>, 784 F.2d 1354, 1356 (9th Cir. 1986). Such a requirement "would defeat the whole object of the treaty." <u>Bingham</u>, 241 U.S. at 517.

- Instead, a certification of extradition is typically based on the authenticated documentary information presented by the requesting nation. <u>See, e.g.</u>, <u>Bovio v. United States</u>, 989 F.2d 255, 259–61 (7th Cir. 1993) (finding Swedish investigator's statement sufficient to

establish probable cause); <u>O'Brien v. Rozman</u>, 554 F.2d 780, 783 (6th Cir. 1977); <u>Shapiro</u>, 478 F.2d at 902–03; <u>In re Extradition of Mainero</u>, 990 F. Supp. 1208, 1212–13 (S.D. Cal. 1997) (finding statements of co-conspirators and other witnesses sufficient in extradition to Mexico); <u>Castro Bobadilla v. Reno</u>, 826 F. Supp. 1428, 1433–34 (S.D. Fla. 1993) (finding documents and statements sufficient for extradition to Honduras), <u>aff'd</u>, 28 F.3d 116 (11th Cir. 1994). In this regard, a foreign prosecutor's or judge's summary of the evidence may be sufficient. <u>Rice v. Ames</u>, 180 U.S. 371, 375–76 (1901); <u>accord</u> <u>Glucksman v. Henkel</u>, 221 U.S. 508, 513–14 (1911); <u>Garcia</u>, 825 F. Supp. 2d at 830 ("[E]xtradition can be predicated entirely on the 'unsworn statements of absent witnesses.'") (quoting <u>Collins</u>, 259 U.S. at 317).

- Article 10 of the Treaty lists the submissions that the state seeking extradition must make in support of its request.

- Article 11 of the 1996 Treaty, as amended by Item II of the Instrument, provides that documents bearing the certificate or seal of the Ministry of Justice, or the Ministry or Department responsible for foreign affairs, of the Requesting State "shall be admissible in extradition proceedings . . . without further certification, authentication, or other legalization."

  - Here, as the Heinemann Declaration states, the documents that France has submitted comply with the Treaty requirements for admissibility at the extradition hearing because they bear the certificate or seal of France's Ministry of Justice. (<u>See</u> Heinemann Decl. ¶ 6.)

- "Courts in general are largely unreceptive to <u>any</u> objections to extradition which "savor of technicality." <u>Nezirovic</u>, 2013 WL 5202420, at *13 (citations omitted) (emphasis in original); <u>see</u> <u>Bingham</u>, 241 U.S. at 517(affirming order requiring extradition where "[a]ll objections savor of technicality").

- 23 -

**D.** **It is For the Executive Branch to Consider All Matters Other Than Sufficiency (i.e., the Rule of Non-Inquiry)**

Other than the sufficiency of the evidence, all matters that a fugitive may raise as defenses to extradition are to be considered by the Secretary of State, not the Court. 18 U.S.C. §§ 3184, 3186. The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. See Escobedo v. United States, 623 F.2d 1098, 1105 (5th Cir.), cert. denied, 623 F.2d 1098 (1980). This is consistent with the long-held understanding that deciding whether to surrender a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's powers to conduct foreign affairs. In re Kaine, 55 U.S. 103, 110 (1852). Similarly, a fugitive's contention that the extradition request is politically motivated or that the requesting state's justice system is unfair should be addressed by the Secretary of State, not the Court. Koskotas, 931 F.2d at 173–74 (noting that requesting state's motives are for the executive branch to consider); see also Venckiene v. United States, 929 F.3d 843, 860 (7th Cir.), cert. denied, 140 S. Ct. 379, (2019) (stating that rule of non-inquiry bars extradition courts from assessing requesting nation's justice system); Arias Leiva v. Warden, 928 F.3d 1281, 1295 (11th Cir. 2019) (same).

Case 1:19-mj-00378-LPA   Document 12   Filed 03/13/20   Page 24 of 27

# IV. __Conclusion__

For all the foregoing reasons, and in reliance on GE 1 and GE 2, the United States respectfully requests that the Court certify that June Hopkins Saia can be extradited to France.

This the 13th day of March, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
UNITED STATES ATTORNEY


/s/ Steven N. Baker
Steven N. Baker
Assistant United States Attorney
N.C. Bar No. 36607
United States Attorney's Office
Middle District North Carolina
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
Telephone: 336-333-6327
E-mail: steve.baker3@usdoj.gov

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

In the Matter of the Extradition of )
)      1:19mj378
June Hopkins Saia a/k/a June Walsh a/k/a )
June Hopkins-Saia Walsh )

<u>CERTIFICATE OF WORD COUNT</u>

I certify that this Brief complies with the word count limit set forth in L.R. 7.3(d). The number of words in this Brief, exclusive of the caption, signature lines, certificate of service, and any cover page or index, according to the word count feature of the word processing software used to prepare the Brief, does not exceed 6,250 words.

This the 13th day of March, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
UNITED STATES ATTORNEY


/s/ Steven N. Baker
Steven N. Baker
Assistant United States Attorney
N.C. Bar No. 36607
United States Attorney's Office
Middle District North Carolina
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
Telephone: 336-333-6327
E-mail: steve.baker3@usdoj.gov

- 26 -

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| In the Matter of the Extradition of | ) | |
| | ) | 1:19mj378 |
| June Hopkins Saia a/k/a June Walsh a/k/a | ) | |
| June Hopkins-Saia Walsh | ) | |

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2020, the foregoing Memorandum was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Helen L. Parsonage at hparsonage@emplawfirm.com

This the 13th day of March, 2020.

Respectfully submitted,

MATTHEW G.T. MARTIN
UNITED STATES ATTORNEY


/s/ Steven N. Baker
Steven N. Baker
Assistant United States Attorney
N.C. Bar No. 36607
United States Attorney's Office
Middle District North Carolina
101 South Edgeworth Street, 4th Floor
Greensboro, NC 27401
Telephone: 336-333-6327
E-mail: steve.baker3@usdoj.gov